# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| FRANKLIN ABERNATHY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. |
| v. ) | 15-10431-FDS |
| ) | |
| KRYSTAL ANDERSON, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM AND ORDER ON MOTION OF DEFENDANT KRYSTAL ANDERSON FOR SUMMARY JUDGMENT

**SAYLOR, J.**

This is a civil rights action arising out of an alleged attack on a prisoner by correctional officers at Souza Baranowski Correctional Center. Plaintiff Franklin Abernathy has asserted claims under 42 U.S.C. § 1983 and state tort law.

The complaint alleges that several correctional officers aggressively pulled and twisted Abernathy's arms through a slot in his cell door, causing various injuries, and that other officers either failed to intervene or attempted to cover up the incident. It also alleges that the sole remaining defendant, Krystal Anderson, a nurse at UMass Correctional Health ("UMCH"), refused to provide treatment to Abernathy. The complaint asserts claims against Anderson for negligence, negligent infliction of emotional distress ("NIED"), and a claim under 42 U.S.C. § 1983 for deliberate indifference to medical needs, in violation of the Eighth Amendment to the United States Constitution.

For the reasons set forth below, Abernathy's injuries do not meet the standard of a

"serious medical need" within the meaning of the Eighth Amendment, and therefore his claim of deliberate indifference must fail. Furthermore, his claims of negligence were referred to a medical malpractice tribunal, which concluded that there was not sufficient evidence to proceed, and he did not post the required bond. Summary judgment will therefore be granted to nurse Anderson.

## I.     Background

Except where otherwise noted, the following facts are set forth in the record and are undisputed.

### A.     Factual Background

In April 2013, Franklin Abernathy was an inmate at Souza Baranowski Correctional Center ("SBCC"). (Abernathy Aff. ¶ 1). He was assigned to a cell in the Special Management Unit with inmate Leon Shelby. (*Id.*; Def. Ex. 2 at 5).[1]

Krystal Anderson was working as a nurse at SBCC on that date. (Anderson Aff. ¶ 5; Anderson Dep. at 22-23). She was employed by UMass Correctional Health ("UMCH"). (Anderson Aff. ¶ 2).[2] Her job responsibilities included providing medical assessment and treatment to SBCC Special Management Unit inmates. (Anderson Dep. at 29).

On the morning of April 3, 2013, correctional officer ("CO") Kyle Sheldon instructed Abernathy to remove a blanket that Shelby had placed over the window in the cell. (Abernathy Dep. at 53; Def. Ex. 2 at 5). Abernathy refused because the blanket belonged to Shelby.

---

[1] Abernathy generally disputes the admissibility, and at times the relevance, of the statements recorded in the OIS Investigation report, which is Defendant's Exhibit 2. Except where otherwise noted, however, he does not appear to dispute the veracity of those statements. *See, e.g.*, Pl.'s Statement of Disputed Facts ¶¶ 11-14, 17-18, 23-28, 34-42.

[2] Anderson attested that UMCH is a program through the University of Massachusetts Medical School and that she participated in the benefits program for University of Massachusetts Medical School employees. (Anderson Aff. ¶¶ 3-4). She further attested that she received a W-2 form from the Commonwealth of Massachusetts, and was eligible for the Commonwealth Retirement Program. (*Id.* ¶ 4).

2

(Abernathy Dep. at 53). Shelby also refused to remove the blanket. (*Id*.; Def. Ex. 2 at 5).

Later that morning, Sergeant Michael Rumery and Anderson came to Abernathy's cell to administer his daily medications. (Abernathy Dep. at 54-56; Def. Ex. 2 at 5). Sergeant Rumery requested that Abernathy remove the blanket from the window, but he again refused, explaining that the blanket belonged to Shelby and therefore was not his responsibility. (Abernathy Dep. at 55; Def. Ex. 2 at 5). Sergeant Rumery then instructed Shelby to remove the blanket from the window, but Shelby again refused. (Abernathy Dep. at 55). Sergeant Rumery told Abernathy that he would not receive his prescribed medication if the blanket was not removed from the window. (*Id*.; Def. Ex. 2 at 5). He then instructed Anderson not to give any medicine to Abernathy, stating that "[h]e ain't getting shit." (Abernathy Dep. at 57; Anderson Dep. at 45).[3]

Anderson stated to OIS investigators that Abernathy received his medication later that day after "everything calmed down." (Def. Ex. 2 at 27). Abernathy, however, testified that he did not receive his medication until the next day. (Abernathy Dep. at 174-75). He further testified that the delay caused him to experience severe chest pain, muscle spasms, and pain in his left shoulder for 24 hours. (*Id*.).

Around noon, CO Sheldon went to the cell to provide lunch. (*Id*. at 64; Def. Ex. 2 at 5). An altercation between CO Sheldon and Shelby ensued. Sergeant Rumery then returned to the cell and ordered that Shelby and Abernathy be placed in restraints. (Def. Ex. 2 at 6). Abernathy stuck his hands out of the cell door to be handcuffed. (Abernathy Dep. at 93).

Abernathy testified that the correctional officers used force to put on his handcuffs. He testified that they slammed or squeezed the handcuffs on his wrists tightly, which stopped his

---

[3] Anderson testified that she and Sergeant Rumery could not see inside the cell because the blanket blocked the light from the window, so that it was unsafe for her to reach in and dispense the medication. (Anderson Dep. at 44-45). Abernathy, however, testified that the light was on and the cell was not dark, and thus disputes that there were legitimate safety concerns. (Abernathy Dep. at 54).

3

circulation, and that they pulled on the handcuffs, and pulled and twisted his fingers and hands, causing bleeding and pain. (*Id*. at 94-109; Abernathy Aff. ¶ 2).[4]

Following the incident in the cell, Abernathy was escorted by correctional officers to the Management Unit medical triage room. (Abernathy Aff. ¶ 3). According to Abernathy, Anderson was the nurse on duty at that time and was standing in the doorway when he arrived. (*Id*. ¶ 4).

According to Abernathy, he had visible cuts, bruises, and swelling. (*Id*. ¶ 5).[5] Shelby testified that he saw him "bleeding out of his hand." (Shelby Dep. at 53). Abernathy contends that despite those visible injuries, Anderson did not assess his medical needs and refused to provide him with any medication or treatment. (Abernathy Aff. ¶¶ 5-6). He further testified that CO Shaun Dewey told Anderson to treat him, to which she allegedly replied, "I'm not giving him shit, and I'm not touching him." (Abernathy Dep. at 128).

In her deposition, which was taken in 2018, Anderson testified that Abernathy never presented for a medical examination on April 3, 2013, and that she was never told that he wanted an examination. (Anderson Dep. at 52). However, in 2013, she stated to OIS investigators that she visually assessed Abernathy on April 3, and that he appeared to be fine and had no complaints. (Def. Ex. 2 at 26). At that time, she further stated, as recounted by the investigators, that she did not submit a medical assessment report because "Abernathy was not the issue" in the altercation between CO Sheldon and Shelby. (*Id.*).

There is also a dispute as to the timing and nature of Abernathy's injuries. Abernathy

---

[4] Sergeant Rumery stated to OIS investigators that there were no issues while Abernathy was being placed in restraints. (Def. Ex. 2 at 19). He also stated that he did not observe any conflict between the correctional officers and Abernathy, and that he did not observe any injuries on Abernathy. (*Id.* at 20).

[5] Abernathy has submitted what he says are photos of his wrists taken on April 9, several days after the incident. (Pl. Ex. 5; Abernathy Dep. at 145-46).

4

attested that Anderson's failure to assess and treat his medical needs and administer his medication caused him to endure physical pain, as well as fear and anxiety. (Abernathy Aff. ¶ 7). Anderson, however, contends that Abernathy testified at his deposition that he did not suffer emotional distress, mood swings, loss of sleep, or loss of appetite. Abernathy disputes that characterization of his testimony.

The dispute appears to arise out of ambiguities in Abernathy's testimony as to whether the disputed statements concern what Abernathy experienced in 2013, or what he was experiencing at the time of his deposition in 2018. For example, he was asked and answered as follows:

> Q: In that second interaction with Krystal [Anderson] *on that day*[, April 3, 2013], did [Anderson] cause you to experience fear?
>
> A: No, I didn't *have* no fear from her.
>
> Q: Did [Anderson] cause you to experience anxiety?
>
> A: No.
> . . .
> Q: Do you feel that you *had* emotional distress because of Krystal Anderson's actions?
>
> A: No.
>
> Q: Do you feel that you *have* stress because of Krystal Anderson?
>
> A: No.
>
> Q: Do you feel that you *have* mood swings because of Krystal Anderson?
>
> A: No.
>
> Q: Do you feel you *have* a loss of sleep because of Krystal Anderson?
>
> A: No.
>
> Q: Do you feel you *have* a loss of appetite because of Krystal Anderson?

5

A: No.

(Abernathy Dep. at 178-80) (emphasis added).

On April 4, the day after the incident, Abernathy submitted a sick-call request, reporting that he had a bruise and lacerations on both arms. (Def. Ex. 2 at 27). He also reported that his wrist was strained or broken, and that he needed an x-ray to assess the injury. (*Id.*). OIS investigators, however, concluded that he "did not have any visible injuries [that were] noted by SBCC medical staff" that day. (*Id.*).

Abernathy was medically assessed the following day, April 5. (*Id.*). The treatment notes indicate that he had no bruising, and had only old, healed scars. (*Id.*). He was not provided any treatment at that time.

On April 8, Abernathy reported the April 3 incident to Feltus Bradford, a mental-health professional at SBCC. (*Id.* at 11). He reported to Bradford that he was denied medical treatment on the day of the incident when he was unable to see the nurse. (*Id.*). He also reported experiencing a tingling sensation up his right arm, and "revealed" to Bradford bruises on his left forearm and bicep, bruises on his right arm, and a cut on his right wrist. (*Id.*).

Medical progress notes from April 10 state that Abernathy complained of numbness in his thumb and sciatic nerve pain in his right leg. (*Id.* at 27).

On April 15, an x-ray was taken of Abernathy's right wrist. (Def. Ex. 11). The results of that x-ray showed no fractures, dislocations, or other abnormalities. (*Id.*).

On January 6, 2015, Abernathy was seen at New England Pain Management Consultants Facility after complaining of neck pain shooting down his left arm, as well as numbness and

weakness in his left hand. (Def. Ex. 12).[6] The treating physician noted that the pain reportedly originated from a 2007 incident when Abernathy fell down a flight of stairs. (*Id*.).

Abernathy's medical records indicate that there were a number of occasions between April 2016 and February 2017 when he missed, or did not take, his prescribed medications. (Def. Ex. 11).[7]

At her deposition in 2018, Anderson testified that she did not remember anything about Abernathy's physical condition or whether she spoke to him on April 3, 2013. (Anderson Dep. at 49-50).

B.     **Procedural Background**

Proceeding *pro se*, Abernathy filed the original complaint in this case on February 13, 2015. He brought claims against "Jane Doe a/k/a/ Nurse Kristal" and various other unnamed and named defendants, including various SBCC correctional officers and the medical director of UMCH. On January 30, 2017, Abernathy retained counsel.

The complaint has been amended multiple times. The fourth amended complaint, as limited by the Court's September 28, 2017 ruling, alleges three claims against Anderson: a § 1983 claim for denial of medical care and treatment (Count Three); a claim for negligence (Count Eight); and a claim for negligent infliction of emotional distress (Count Twelve).

On October 27, 2017, Anderson moved for referral of the negligence claims against her to the Superior Court for the limited purpose of convening a medical malpractice tribunal pursuant to Mass. Gen. Laws ch. 231, §60B. The Court granted that motion in part on December

---

[6] Abernathy disputes the relevance of this evidence, but does not appear to dispute its veracity. *See* Pl.'s Statement of Disputed Facts ¶ 70.

[7] The parties dispute why Abernathy missed taking his medications on those occasions, and Abernathy further disputes the relevance of that evidence. *See, e.g.*, Pl.'s Statement of Disputed Facts ¶¶ 71-75.

7

4, 2017, concluding that the matter "involves malpractice claims that should be screened by a tribunal." However, the Court also observed that "[n]ot all claims arising in the medical context . . . must be referred to a medical malpractice tribunal." The Court specifically distinguished Abernathy's negligence claim against Anderson, which alleges that she *negligently* failed to provide medical care, from his § 1983 claim, which alleges that she *intentionally* failed to do so, observing that "one is medical malpractice and the other is a deliberate civil rights violation."

A medical malpractice tribunal was held on November 28, 2018. (Def. Ex. 9). The tribunal found for Anderson, concluding that there was not sufficient evidence to raise a legitimate question as to liability appropriate for judicial inquiry. (Def. Exs. 9-10).

The November 28 tribunal finding for Anderson also stated that, pursuant to Mass. Gen. Laws ch. 231, §60B, Abernathy could pursue his claim through the usual judicial process only if he filed a $6,000 bond. (Def. Ex. 9). It further stated that if the requisite statutory bond were not posted within 30 days of the tribunal's finding, "the action shall be dismissed." (*Id.*).

On December 6, 2018, the matter was returned to this Court in light of the tribunal's findings for Anderson. (Def. Ex. 10).

Abernathy failed to post the requisite bond within 30 days of the tribunal's November 28, 2018 findings. (*Id.*).

On April 29, 2019, the parties stipulated that the action would proceed against Anderson only, and dismissed with prejudice the claims as to all other remaining defendants.[8] Anderson then moved for summary judgment on the three remaining claims against her.

## II. <u>Legal Standard</u>

The role of summary judgment is to "pierce the pleadings and to assess the proof in order

---

[8] The claims as to a number of other defendants had previously been dismissed in August 2017.

8

to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (internal quotation marks omitted). Summary judgment is appropriate when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Essentially, Rule 56[] mandates the entry of summary judgment 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Coll v. PB Diagnostic Sys.*, 50 F.3d 1115, 1121 (1st Cir. 1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). In making that determination, the court must view "the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." *Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir. 2009). When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotations omitted). The non-moving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence." *Id.* at 256-57.

## III. Analysis

### A. Negligence

Count Eight asserts a claim for negligence. To establish such a claim, a plaintiff must prove (1) a legal duty owed by defendant to plaintiff; (2) a breach of that duty; (3) proximate or legal cause; and (4) actual damage or injury. *See, e.g.*, *Jorgensen v. Massachusetts Port Auth.*, 905 F.2d 515, 522 (1st Cir. 1990) (applying Massachusetts law).

The negligence claim in this case was referred to the Superior Court for a medical-malpractice tribunal pursuant to Mass. Gen. Laws ch. 231, § 60B. That statute requires that

9

"[e]very action for malpractice, error or mistake against a provider of health care shall be heard by a tribunal," where "the plaintiff shall present an offer of proof and said tribunal shall determine if the evidence presented if properly substantiated is sufficient to raise a legitimate question of liability appropriate for judicial inquiry or whether the plaintiff's case is merely an unfortunate medical result." *Id.*

"If a finding is made for the defendant . . . the plaintiff may pursue the claim through the usual judicial process only upon filing bond in the amount of six thousand dollars . . . ." *Id.* "If said bond is not posted within thirty days of the tribunal's finding the action shall be dismissed." *Id.*

Here, Abernathy's negligence claim against Anderson was referred to the medical-malpractice tribunal on December 4, 2017. A tribunal was convened, and a report finding in favor of Anderson was issued on November 28, 2018. More than 30 days have passed since that finding, and Abernathy has not posted the requisite bond. By the terms of the statute, he therefore cannot pursue his claim, and the negligence claim against Anderson must be dismissed. Anderson is therefore entitled to summary judgment as to Count Eight.

### B. <u>Negligent Infliction of Emotional Distress</u>

Count Twelve asserts a claim for negligent infliction of emotional distress. To establish such a claim, a plaintiff must show "(1) negligence; (2) emotional distress; (3) causation; (4) physical harm manifested by objective symptomatology; and (5) that a reasonable person would have suffered emotional distress under the circumstances of the case." *Payton v. Abbott Labs*, 386 Mass. 540, 557 (1982); *Sullivan v. Boston Gas Co.*, 414 Mass. 129, 132 (1993).

Anderson has moved for summary judgment on the NIED claim on three grounds. First, she contends that the NIED claim stems from the negligence claim, and therefore must also be

dismissed based on the tribunal's finding, and Abernathy's subsequent failure to post the required bond. She further contends that the claim is barred by the Massachusetts Tort Claims Act ("MTCA"), Mass. Gen. Laws ch. 258, *et. seq.* Finally, she contends the claim fails for lack of evidence. Because the claim is barred by the MTCA, the Court will not address the remaining issues.

Under the Massachusetts Tort Claims Act, individual public employees are immune from suits stemming from negligent conduct committed within the scope of their office or employment. Mass. Gen. Laws ch. 258, § 2; *Wiesman v. Hill*, 629 F. Supp. 2d 106, 113 (D. Mass. 2009) (citing *Jackson v. Town of Milton*, 41 Mass. App. Ct. 908 (1996)). Therefore, whether Abernathy can establish a claim for NIED against Anderson depends on whether she was a public employee acting within the scope of her employment at the relevant time.

"Whether an individual is a public employee is a question of fact." *Williams v. Hartman*, 413 Mass. 398, 400 (1992). A public employer is "any department, office, commission, committee, council, board, division, bureau, institution, agency or authority thereof." Mass. Gen. Laws ch. 258, § 1. It is undisputed that UMCH is part of the University of Massachusetts Medical School, which is a public employer, and that all UMCH employees are Medical School employees. *Lopes v. Riendeau*, 177 F. Supp. 3d 634, 663 (D. Mass. 2016) (citing *McNamara v. Honeyman*, 406 Mass. 43, 48 (1989)).

However, merely receiving a paycheck from a public agency, without more, does not make an individual a public employee. *See Williams*, 413 Mass. at 400. "The determinative question in assessing whether an individual is a public employee within the meaning of the MTCA is whether the individual is 'subject to the direction and control of a public employer.'" *Lopes*, 177 F. Supp. 3d at 663 (quoting *Smith v. Steinberg*, 395 Mass. 666, 667 (1985)). That is

the same test used to determine whether a principal should be liable for an agent's negligent acts under the common law doctrine of *respondeat superior*. *See McNamara*, 406 Mass. at 48.

In the case of a health-care professional, relevant factors for that analysis include whether the employer regulated the employee's hours, where she worked, and which patients she would treat. *Id*. Other factors are whether she also had private patients and if her income was determined by the number of patients. *Id.* Nurses, unlike doctors, "function within the hierarchy of the [facilities] in which they work[, and they] are not free to exercise their independent judgment to the degree that doctors [are]." *Bianchi v. Bartlett*, 2011 WL 1326639, at *10 (D. Mass. Mar. 31, 2011) (quoting *Tomaccio v. Hardy*, 2007 WL 1630961, at *4 (Mass. Super. Ct. May 25, 2007)).

Here, the undisputed evidence shows that Anderson was employed as a nurse at SBCC through UMCH, a public employer, when she allegedly refused to assess and treat Abernathy's injuries. Her job responsibilities as a nurse at the prison included providing medical assessment and treatment. Her alleged failure to assess and treat Abernathy was therefore within the scope of her employment. The failure to assess Abernathy upon seeing his injuries *was* an assessment—she concluded, rightly or wrongly, that further assessment and treatment was not needed. She is therefore immune from suit as to Abernathy's claim for NIED under the MTCA.

Accordingly, Anderson is entitled to summary judgment as to Count Twelve.

### C. Violation of § 1983

Count Three is a claim under 42 U.S.C. § 1983 that Anderson violated the Eighth Amendment through deliberate indifference to Abernathy's serious medical needs. Specifically, the complaint alleges that Anderson deliberately refused to provide Abernathy with medical treatment and assessment.

### 1. <u>Generally</u>

"[T]o succeed in an Eighth Amendment claim under section 1983 claim based on denied . . . medical care," a plaintiff must prove (1) an objectively serious medical need and (2) that the defendant exhibited "deliberate indifference" to the prisoner's needs. *Lopes*, 177 F. Supp. 3d at 657 (citing *Kosilek v. Spencer*, 774 F.3d 63, 82 (1st Cir. 2014)). "Deliberate indifference" requires that the defendant be subjectively "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [she] must also draw the inference." *Ruiz-Rosa v. Rullan*, 485 F.3d 150, 156 (1st Cir. 2007) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). Mere medical negligence will not support a § 1983 claim. "[R]ather, the treatment provided must have been so inadequate as 'to constitute an unnecessary and wanton infliction of pain' . . . ." *Lopes*, 177 F. Supp. 3d at 657-58 (quoting *Leavitt v. Correctional Med. Servs., Inc.*, 645 F.3d 484, 497 (1st Cir. 2011)).

The requirement to bring state medical-malpractice claims before a tribunal does not apply to constitutional claims under the Eighth Amendment for deliberate indifference. *See Britto v. UMass Corr. Health*, 2018 WL 3589078, at *3 (D. Mass. July 26, 2018); *see also Mackenzie v. Nelson*, 2015 WL 1308800 (D. Mass. Mar. 23, 2015) (addressing whether plaintiff had stated a claim for deliberate indifference under the Eighth Amendment after separately referring medical malpractice claims to tribunal); *Rua v. Glodis*, 2012 WL 4753279 (D. Mass. Oct. 3, 2012) (same); *Black v. United States*, 2012 WL 3201677 (D. Mass. Aug. 3, 2012) (same); *Brace v. Massachusetts*, 673 F. Supp. 2d 36, 41-42 (D. Mass. 2009).

### 2. <u>Serious Medical Need</u>

Whether a plaintiff inmate has a "serious medical need" is a fact-specific inquiry. *Leavitt*, 645 F.3d at 500. Some medical conditions, such as being HIV-positive, are plainly

serious. *Id.* Others, such as application of a paste which the prisoner himself could apply, are not. *See Sires v. Berman*, 834 F.2d 9, 12 (1st Cir. 1987). The First Circuit has stated that bruises and abrasions, even if "obvious" in that sense that they are visible, do not constitute a serious medical need unless they "ha[ve] been diagnosed by a physician as mandating treatment, or . . . [they are] so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 208 (1st Cir. 1990). "The 'seriousness' of an inmate's needs may also be determined by reference to the effect of the delay of treatment." *Id.* (quoting *Monmouth County Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3rd Cir. 1987)).

In *Gaudreault*, the First Circuit concluded that the plaintiff inmate did not display a serious medical need where he was found to be "bruised but unbroken, requiring no more medical care [for his bruises and abrasions] than a sling, an eye-patch and the application of some disinfectant." 923 F.2d at 208. Another court has found similarly that a "superficial laceration"—that is, a cut "that is not deep and/or likely to need stitches"—"is not an injury that would create a sense of urgency or produce death, degeneration or extreme pain," and does not constitute a serious medical need "[a]bsent additional allegations of infection, profuse bleeding, and/or other complications." *El-Massri v. New Haven Corr. Ctr.*, 2018 WL 4604308, at *9 (D. Conn. Sept. 25, 2018).

It is true that in *Fowles v. Stearns*, 886 F. Supp. 894 (D. Me. 1995), the District Court concluded that evidence of visible bruises and abrasions on the recently assaulted inmate's face, arms, shoulders, and hip was sufficient to survive summary judgment. 886 F. Supp. at 900. However, in reaching that conclusion, the court specifically relied on a comment from a medical-screening form completed at the jail soon after the plaintiff's assault, which "recommend[ed] that

Mr. Fowles be examined by a physician." *Id.* Because "at least one individual involved with the processing of Fowles concluded that his injuries required medical attention and that that conclusion was ignored by [the defendant]," the court found sufficient facts to generate a genuine issue of material fact as to a serious medical need. *Id.*

Here, Abernathy stated that on April 3 he was escorted by correctional officers to the medical triage room following the incident in the cell. He further stated that when he arrived, he presented to Anderson with visible cuts, bruises, and swelling. Shelby also testified that he saw Abernathy "bleeding out of his hand" during the incident. Abernathy contends that despite those visible injuries, Anderson did not assess his medical needs and refused to provide him with any medication or treatment.

The day after the incident, Abernathy submitted a sick-call request reporting that he had bruises and lacerations on both arms. Several days after that, he apparently "revealed" bruises on both arms and a cut on his wrist to a mental-health professional. He also stated that Anderson's failure to assess and treat his medical needs and administer his medication caused him physical and emotional injuries. He testified that the one-day delay in treatment caused him to experience severe chest pain, muscle spasms, and pain in his left shoulder for 24 hours.[9]

When Abernathy was ultimately examined, however, the attending physician did not diagnose any serious condition or prescribe or provide any treatment. And there is no evidence that his condition was exacerbated in any matter by the delay, or that the delay in treatment caused him any permanent damage. *See Jesionowski v. Beck*, 937 F. Supp. 95, 103 (D. Mass.

---

[9] According to Abernathy, he did not receive his medications until the next day. According to Anderson, however, the delay was only a matter of hours. Because the court on summary judgment must view "the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor," *Noonan*, 556 F.3d at 25, the Court will assume that Abernathy's medications were delayed for a day. There is no evidence in the record, however, that the delay caused or exacerbated a serious medical need.

1996) (concluding that a forehead laceration that bled profusely during a 30-minute delay in treatment, but was not exacerbated by the delay and did not result in any permanent damage, was not a serious medical need).

According to the record, therefore, Abernathy was "bruised but unbroken," with superficial lacerations that did not require stitches and that did not lead to infection or other complications. *See Gaudreault*, 923 F.2d at 208; *Jesionowski*, 937 F. Supp. at 103; *El-Massri*, 2018 WL 4604308, at *9. Even assuming his bruises and cuts were visible to Anderson on April 3, as he alleges, "the medical record demonstrates that he did not display any *needs* so patent" "that even a lay person would easily recognize the necessity for [medical] attention." *See Gaudreault*, 923 F.2d at 208. He therefore has not established that nurse Anderson was deliberately indifferent to a "serious medical need" within the meaning of the Eighth Amendment.

Nonetheless, if Abernathy is telling the truth—which, at this stage, must be assumed—this outcome gives the Court at least some pause. Again, Abernathy contends that he suffered bruises, abrasions, and cuts; that he was taken by correctional officers to the medical triage room, where nurse Anderson was on duty; and that she refused even to examine him, much less treat him. Abernathy's injuries were not, as it turns out, very serious. He received a medical assessment the next day (no treatment was prescribed) and an x-ray 12 days later (no abnormalities were revealed). But no one disputes that he had suffered *some* form of injury, and whether he had internal injuries was of course unknown at the time the nurse refused to examine him.

Health-care providers in a prison environment surely have a heightened responsibility to provide proper attention and care to inmates. An inmate who is refused treatment, or even

16

examination, obviously cannot go somewhere else. And whether someone has a serious injury may not be immediately apparent; ignoring what appears to be mere bruising and swelling, with complaints of pain, surely presents a significant risk of ignoring broken bones, ruptured tendons, internal bleeding, or other serious injuries.[10] The possibility that a prison nurse could refuse to perform an assessment on a prisoner, without legal consequence, is troubling.

Nonetheless, the standard under the Eighth Amendment requires that health-care providers be deliberately indifferent to a "serious medical need." According to the case law, bruises, abrasions, and cuts not requiring stitches are not sufficient to qualify as "serious." Accordingly, the Court will grant summary judgment in favor of nurse Anderson.

## IV.   Conclusion

For the foregoing reasons, the motion of defendant Krystal Anderson for summary judgment is GRANTED.

**So Ordered.**


                                              /s/ F. Dennis Saylor
                                              F. Dennis Saylor IV
Dated: July 31, 2019                          United States District Judge

---

[10] Consider, for example, a nurse who ignores two prisoners who present with complaints of abdominal pain. One turns out to be suffering from a serious medical need (say, appendicitis) while the other is not (say, a stomachache). It seems anomalous that the first prisoner has a viable Eighth Amendment claim and the second does not; liability depends not on her conduct (which is the same in both instances) but on the ultimate medical diagnosis.